## NATHAN C. D. TAYLOR vs. JOSHUA L. TAYLOR et al.

The Legislature by an act approved March 3, 1863, provided (subject to the approval of the electors of the county) that the county seat of Chisago County should be removed from Taylor's Falls to Chisago City, and said law was submitted at the next general election to the electors of said county for their adoption, in pursuance of *Sec.* 1, *Art.* 11 *of the Constitution.* In certain towns in said county at said election the Judges and Clerks of election did not take the prescribed oath, or any oath, and no list of qualified electors was kept as required by law, and in one town one of the Judges of election was a candidate for Representative to the State Legislature. *Held*—that notwithstanding such errors and irregularities on part of the officers of the election, it was the duty of the County Canvassing Board to canvass the returns from said towns, and their certificate was *prima facie* evidence of the result of the election. The burden of proof was on the contestant to show that the errors complained of affected the result or rendered it uncertain.

If the votes of the citizens are freely and fairly deposited, at the time and place designated by law, the intent and design of the election are accomplished. It is the will of the electors thus expressed that gives the right to the office, or determines the question submitted, and the failure of the officers to perform a mere ministerial duty in relation to the election, can not invalidate it if the electors had actual notice and there was no fraud, mistake or surprise.

If the officers of election fail to perform their duty the law provides a penalty, but the election is not *necessarily* rendered void.

The object of requiring the " points" of contest to be stated, is for the purpose of informing the adverse party of the grounds of contest, so that he may prepare to meet them and may not be taken by surprise; each party to a contested election is therefore required when he becomes actor to give notice of the *specific* grounds on which he intends to assail either the election or the correctness of the returns or canvass.

*Sec.* 1, *Art.* 11 *of the Constitution* requires only (for the adoption of such law) a majority of the electors present and voting at such election.

When the literal interpretation of an instrument involves any absurdity, contradiction, injustice or extreme hardship, the Courts may deviate a little from

the received sense and literal meaning of the words, and interpret the instrument in accordance with what may appear to have been the intention and meaning of its framers, and the real intention, when accurately ascertained, must in all cases prevail over the literal sense of the terms.

The meaning of particular words in statutes, as well as other instruments, is to be found not so much in the strict etymological propriety of language, nor even in popular use, as in the subject or occasion on which they are used and the object that is intended to be attained.

As a general rule it is the duty of every elector to attend and vote at the general elections, and the law presumes that every citizen does his duty. In the eye of the law, therefore, those present and voting at such election constitute the electors of the county.

The constitutional debates can not properly be resorted to as aids in the construction of the constitution.

This is a proceeding under the provisions of *sec. 56 of chapter 15 of the Laws of* 1861, contesting the validity of an election held at a general election on the 3d day of November, 1863, submitting to the electors of Chisago County, for their approval or rejection, the question of the removal of the county seat of that county from Taylor's Falls to Chisago City, in pursuance of an act of the Legislature of the State of Minnesota, approved March 3, 1863. The plaintiff, an elector of said county, served a notice of such contest upon the County Commissioners of said county, (the defendants), which was verified December 3, 1863, and filed in the office of the Clerk of the District Court for said county December 22, 1863, wherein the points upon which such election would be contested are set forth substantially as follows: That said county is divided into seven organized townships—Chisago Lake, Franconia, Sunrise, Wyoming, Taylor's Falls, Amader and Rushseba; that in four of said townships, to-wit, Chisago Lake, Franconia, Sunrise and Wyoming, at said election some or all of the following irregularities occurred: the persons acting as Judges and Clerks of election did not take and subscribe the oath or affirmation required by law; no lists of the qualified electors of the election district were kept, and none transmitted with the returns to the Auditor of said county as required by law; and that

in the township of Franconia one Ansel Smith, who was at the time a candidate for the office of Representative to the State Legislature, acted as one of the Judges of election ; that by reason of said irregularities the election returns transmitted to the Auditor of said county from said townships were fraudulent and void ; that the Board of Canvassers of said county accepted and canvassed said returns, and included the same in making their computation of the number of votes cast in favor of and against the removal of said county seat ; that by so doing the number of votes in favor of said removal was increased 192, and against said removal 19 ; that by reason thereof the abstract of the votes cast in favor of and against said removal, prepared by said Board, is erroneous and void ; that by including the vote of said four townships, said Board of Canvassers counted two hundred and nine votes in favor, and one hundred and forty-six against said removal, as the aggregate vote of said county on said question ; that a majority of the votes cast on the question of the removal of said county seat were cast against said removal.

Said notice further sets forth that the entire number of qualified electors in said county exceeds 486 ; that rejecting the returns from the townships Chisago Lake, Franconia, Sunrise and Wyoming, the election returns on file in the office of the Auditor of said county show only seventeen cast in favor of said removal ; that said removal has not been approved by a majority of the electors of said county.   The relief prayed for in said notice is, that by the judgment and decree of the Court Taylor's Falls be declared the county seat of Chisago County.

One of the qualified electors of said county appeared in said proceeding, and demurred to the said notice on the ground that " it does not contain a statement of facts sufficient to entitle the contestant to the relief demanded."

The demurrer coming on to be heard at the October general term of the Chisago County District Court, was overruled by the Court and Taylor's Falls adjudged to be the county seat of said county.

Taylor v. Taylor et al.

From the order overruling said demurrer and the judgment thereon, the defendants appeal to this Court.

L. E. Thompson for Appellant.

H. N. Setzer for Respondent.

*By the Court*—Wilson, C. J.—The Legislature by an act approved March 3, 1863, provided (subject to the approval of the electors of the county) that the county seat of Chisago County should be removed from Taylor's Falls to Chisago City. *See Session Laws* 1863, *p.* 204.

The law was submitted at the next general election to the electors of said county for their adoption, in pursuance of *Sec.* 1, *Art.* 11 *of the Constitution.* The county canvassing board, to whom the returns of the election were made, declared and certified that said law was adopted by a majority of the electors.

The plaintiff, being a resident and qualified elector of the county, thereupon gave notice that he would contest the validity of the election, and for that purpose commenced this action. *See Laws of* 1861, *p.* 118, *sec.* 56. To the notice the defendants demurred, and the demurrer was overruled and judgment rendered for the plaintiff in the Court below, and the defendants appeal to this Court.

The points or grounds of contest set out by the plaintiff are: (1) that the election returns from four townships of said county were invalid on account of a non-compliance with the election laws by the officers of the election, and (2) that, admitting the returns to be valid, still a majority of the electors of said county did not vote in favor of the removal.

Under the first head the plaintiff specifies several irregularities or errors which he claims render void the returns from and the election in several towns, and the canvass of the county canvassing board.

It is not very apparent whether the plaintiff by this proceeding

attempts to attack the returns, the canvass, or the election, but we take it for granted that he attacks the election, as well as the canvass and returns, this view being most favorable to his case.

The plaintiff in his notice of contest states that he "contests the validity of the said election, and specifies the following points on which said election will be contested to-wit:

"For the first point the said Nathan C. D. Taylor alleges that the county of Chisago is divided into seven organized townships, to-wit: Chisago Lake, Franconia, Sunrise, Wyoming, Taylor's Falls, Amador and Rushseba. That after the last general election there were transmitted to the County Auditor of Chisago County certain papers purporting to be the election returns of the township of Chisago Lake aforesaid. That the said papers are in truth and in fact no election returns, but are fraudulent and void, for the reason the persons pretending to be the judges and clerks of said election did not take and subscribe the oath required by law, nor any other oath or affirmation whatever, and for the farther reason that no list of the qualified electors of the election district composed of said town of Chisago Lake was returned or enclosed or transmitted with the said papers purporting to be the election returns of the town of Chisago Lake, and that it appears from the papers aforesaid that there were no register poll lists at said supposed election whatever."

Some or all of these errors are alleged to have existed and rendered void the returns from the towns of Franconia, Sunrise and Wyoming; and in Franconia it is alleged that Ansel Smith, who was a candidate for the office of Representative to the State Legislature, acted as one of the judges of election.

It was undoubtedly the duty of the county canvassing board to canvass the returns. *Sec.* 43, *chap.* 15, *of the Laws of* 1861, under which the election was held, provides that "no election returns shall be refused by any Auditor for the reason that the same may be returned or delivered to him in any other than the manner directed in this act; nor shall the canvassing board of the county refuse to include any returns in their estimate of votes, for any informality in holding any election or making returns thereof."

Here the duty of the Auditor and canvassing board is plainly pointed out. It was not competent for them to undertake to decide whether the errors or irregularities complained of invalidated the election in the towns named. That was a question for judicial, not for ministerial officers—a question that could only be decided by a court that could call in witnesses, hear evidence and decide questions of law and fact.

Irrespective of the above statutory provision, it is quite clear that this question could not properly be decided by the canvassing board. See O'Farral vs. Colby, 2 Minn., 180.

The canvassing board, therefore, we think acted correctly in canvassing said returns, and their certificate is prima facie evidence of the facts therein stated and certified to. But that certificate is only prima facie evidence, and the District Court in which this action was brought can go behind it and inquire as a matter of fact whether the canvass was fairly conducted, and whether the result of the election is truly set forth in the certificate; but the burden of proof is on the contestant (plaintiff) to show that there were irregularities and that they affected the result. Whipley vs. McKune, 12 Cal., 352; People vs. Cook, 4 Selden, 67; 14 Barb., 259; Lanier vs. Gallatus, 13 La. An. R., 175; State vs. Mason, 14 Id., 505; Bashford vs. Barstow, 4 Wis., 567.

The facts stated in the notice being admitted by the demurrer, the question presented is whether these errors or irregularities rendered void the election in said towns. It will be observed that fraud is not charged, nor is it alleged that any illegal votes were polled or that any legal votes were excluded.

The law requires the judges of election to take the prescribed oath and to keep register poll lists, and forbids a candidate at such election to act as one of the judges, but it is in no place provided that a failure to comply with the law in any of these respects shall make void the election. The public good demands that the will of the people as expressed at the ballot box should not be lightly disturbed. There is hardly an election held in any county at which in some town irregularities do not occur, and to declare

Taylor v. Taylor et al.

every such election void would work a manifest hardship and injustice. If the votes of the citizens are freely and fairly deposited at the time and place designated by law, the intent and design of the election are accomplished.   It is the will of the electors thus expressed that gives the right to the office or determines the question submitted, and the failure of the officers to perform a mere ministerial duty in relation to the election can not invalidate it if the electors had actual notice and there was no mistake or surprise.  *See People vs. Cook; Shepley vs. McKune; Lanier vs. Gallatus; Bashford vs. Barstow; State vs. Mason; Gorham vs. Camp,* 2 *Cal.,* 635 ; *Andrew vs. Lanier,* 13 *La. An. R.,* 301 ; *State vs. Elwood,* 12 *Wis.,* 551 ; *People vs. Pease,* 13 *E. P. Smith's R.; Carpenter vs. Ely,* 4 *Wis.,* 420 ; *In the Matter of the Mohawk and Hud. Riv. R. R. Co.,* 19 *Wend.,* 143.

The plaintiff's counsel in his argument admits that as a general principle of law, statutes directing the mode of proceeding of public officers are merely directory, *unless there is something in the statute itself which plainly shows a different intent,* and refers to *section* 4 *of the Election Law,* which, after prescribing the duty of the town clerk to post notices of the time and place of holding the election, adds : " Provided that no failure of any clerk to give notice of any election as aforesaid shall invalidate any election."

The exception in this section he insists shows the intention of the law to invalidate an election for the disregard of any other prescribed formality or duty by the officers, applying the maxim, "*Expressio unius est exclusio alterius.*"

This is a principle or rule of logic as well as a maxim of the law of very extensive practical application, both in the construction of written instruments and verbal contracts, but great caution is requisite in its application. *Broom's Maxims,* 595 ; *Eastern Archipelago Co. vs. The Queen,* 2 *Ellis & B.,* 856–879 ; *Price vs. Great Western R. C.,* 16 *M. & W.,* 244.

The application of this maxim in this case seems forced and unauthorized.

The rule of law has long been well settled that the failure of the

officers of an election (as in this case,) to perform their duties strictly as required by statute, does not invalidate the election.

It is certainly true as a matter of fact, and presumed to be true as a matter of law, that the Legislature knew this rule ; and we must suppose that if they had intended to change a rule of law of such practical importance, they would have done so directly and in unequivocal terms.

By the provision in section 4 of the election law (above quoted,) the law on that subject is not changed.

The statute requiring that notice was directory, and the validity of the election did not depend upon the notice, (*People vs. Hart-well*, 12 *Mich. R.* ; *Marchant vs. Langworthy*, 6 *Hill*, 646,) and it is a maxim of the law that "*Expressio eorum qui tacitae insunt nihil operatur.*" If on account of the aforementioned errors in the election, the result of the vote was rendered uncertain in the towns designated, perhaps the returns from those towns should be rejected.

Or if the election was attacked for fraud on this account, and it should appear that the errors were caused by a party interested, that perhaps would be *prima facie* evidence of fraud requiring satisfactory explanation. But as we above stated, the person attacking the canvass must in every case show that there was error, and that that error affected the result or rendered it uncertain. The plaintiff has not pretended to do either in this case.

It is not necessary for us to particularize in this case. All the errors complained of under the first head, fall within the same principle, and are covered by the authorities cited. If the officers of the election have failed to perform their duty the law provides a penalty ; but the officers only can be punished, they alone having erred.

After specifying particularly the errors above referred to, the plaintiff adds : "And the said Nathan C. D. Taylor alleges that a majority of the votes cast on the question of the removal of the county seat from Taylor's Falls to Chisago City, were cast against the removal of the said county seat of Chisago county."

This we think was intended merely as an inference or conclusion

Taylor v. Taylor et al.

from the facts before stated; because on the argument plaintiff's counsel did not claim that this was a sufficient statement of the ground on which the election was contested. If this had been deemed sufficient, no more minute or elaborate statement would have been made. But whether plaintiff's counsel regarded this a sufficient statement, it is not necessary here to inquire; if sufficient in the eye of the law it is admitted by the demurrer, not otherwise. The statute requires that a notice shall be given "expressing the points on which the same (the election) will be contested."

The object of requiring the "points" of contest to be stated is manifestly for the purpose of informing the adverse party of the *grounds of contest*, so that he may prepare to meet them and may not be taken by surprise. Section 51 of the election law, (*Laws* 1861, *page* 115,) reads as follows: "No testimony shall be received by the justice on the part of the person contesting the election, which does not relate to the point specified in the notice. * * * Provided, That a party whose election is contested may give to the contestant a like notice as provided in Sec. 49 of this act, (section above quoted,) and thereupon the introduction of testimony shall be likewise confined to the specifications contained in said notice." A specification here clearly implies an enumeration of particulars; not a statement so general that the ground of contest cannot be inferred from it.

This case is a good illustration of the insufficiency of such a general statement. The statement that the majority of votes cast were against the removal, gives not the least intimation of the grounds of contest or of any of them. We think, therefore, that in this class of cases each party to the contested election, when he becomes actor must give notice of the *specific* grounds on which he intends to assail either the election or the correctness of the returns or canvass.

By silently passing over the objections to the form of the notice in this case, we do not wish to be understood as tacitly deciding that those objections are untenable. The view which we have

taken as above expressed, renders unnecessary a consideration of those objections.

The Court below we think correctly held that on the first ground of contest, specified in the notice, the demurrer was well taken.

We now come to the second ground of contest. The plaintiff states in his notice : "That it appears from the election returns of the last general election of the towns of Taylor's Falls, Amador and Rushseba that the aggregate number of qualified electors in said towns is 236 ; that the number of qualified electors in the town of Wyoming is 96. That the said Taylor of his own knowledge cannot state the exact number of qualified electors in the townships of Chisago Lake, Franconia and Sunrise, and that no election returns in said towns are on file in the County Auditor's office, from which such number can be precisely ascertained; but said Taylor avers that the aggregate number of electors in said three last mentioned townships exceeds 154. That the entire number of qualified electors in the county of Chisago exceeds 486. That the election returns in the office of the County Auditor, rejecting the fraudulent papers in the first point of this notice set forth, show only 17 votes cast in favor of the removal of the county seat to Chisago City aforesaid, and that the question of the removal of the county seat * * * has not been adopted by a majority of the electors of said county."

This point involves a construction of Sec. 1, Art. 11 of the Constitution, which is in the following language : "And all laws changing county lines in counties already organized or for removing county seats, shall before it takes effect be submitted to the electors of the county or counties to be affected thereby at the next general election after the passage thereof, and be adopted by a majority of such electors." The plaintiff claims that this section requires an absolute majority of those qualified to vote in the county at the time of the election.

This construction is perhaps in accordance with the letter of the Constitution, but it leads to such practical inconvenience, hardship and absurdity, we cannot believe it to be in accordance with the spirit and meaning of that instrument.

Taylor v. Taylor et al.

It will be observed that the returns of the canvassing officers would not be even *prima facie* evidence of the result of such election, for such returns could only show the numbers voting and the result of the vote. In every case it would be necessary, if this construction is correct, to show by legal evidence the actual number of persons legally qualified to vote in the county at the time of such election, and we are unable to see how this could be determined except by a suit or proceeding in a Court qualified to decide authoritatively and finally such questions. The difficulty of making such proof in many cases would be so great as to make it impracticable.

It is not claimed that Courts have anything to do with the propriety or expediency of a law, or that they can correct what they may deem either excesses or omissions in legislation, or relieve against the occasionally harsh operation of statutory provisions ; their duty is only to interpret the *will* of the framers of the instrument, to be construed by exploring their *intentions* at the time when the instrument was framed.

When a particular construction of an instrument leads to hardship, inconvenience or absurdity, the respect due from Courts to a co-ordinate branch of the government or to a constitutional convention, will not permit them readily to presume that such construction was intended, and they will under such circumstances a little deviate from the received sense of the words, not because they have a right to disregard the will of the framers of the instrument, but for the purpose of truly arriving at and carrying out their will.

The authorities sanctioning this course are so numerous we can only refer to a few of them. The law in New York in 1814, provided that "it shall not be lawful for any sheriff or any other officer to whom any such execution shall be directed, or any of their deputies or any person for them or either of them, to purchase any goods or chattels, lands or tenements at any sale by virtue of any execution, and all purchases so made by them shall be void."

At the time of the sale hereafter referred to, Schofield was deputy sheriff and plaintiff in the execution, and Wadhams purchased

vol. x;—16

for his use.    Savage, Ch. J., in delivering the opinion of the Court, says: "Admitting as the plaintiff does that Wadhams purchased for the use of Schofield, the purchase comes within the letter of the act; but it could never have been the intention of the Legislature to prevent a deputy sheriff, when plaintiff in an execution, from bidding in order to secure his money.    The object was to prevent abuse—that the sheriff or his deputies should not be allowed to become purchasers at their own sales and thereby be induced to conduct corruptly in relation to them, but surely it was never intended to place these persons in a worse situation than others as to the collection of their own demands.    Whenever the intention of the makers of a statute can be discovered, it ought to be followed with reason and discretion in the construction of the statute, although such construction seem contrary to the letter of the statute.    *Bac. Ab., Tit. Statute, (I)* 15 *Johns.*, 380, *per Ch. J. Thompson.*    A thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers.    This proposition is fully established and illustrated by the cases cited on the part of the plaintiff."    *Jackson vs. Collins,* 3 *Cowen,* 89.

In delivering the opinion of the Court in *Donaldson vs. Wood,* 22 *Wend.*, 396, the Chancellor says: "Legal hermeneutics, when applied to the construction of statutes, teach us to reject a construction which is contrary to natural justice and equity, or which will be necessarily productive of practical inconvenience to the community, unless the language of the law-giver is so plain and explicit as not to admit of different construction.    To give a correct interpretation to the legislative will, when a statute was intended to remedy the injurious operation of a previous rule or principle of law, the Court should place itself in the situation of the Legislature which passed the statute ; that is, to contemplate in the first place the law as it previously existed and the necessity and probable object of the change, and then give such a construction to the language used by the law-makers in providing the remedy as to carry their intention into effect, so far as it can be ascertained from the terms of the statute itself."

In 6 *Hill*, 616 (*Watervleit Turnpike Co. vs. McKean*) the Court uses the following language : "There are other well established principles and maxims for the interpretation of statutes which lead to the same result. Every statute ought to be expounded, not according to the letter, but according to the meaning. *Qui haeret in litera haeret in cortice. Dwarris on Statutes*, 690. And the intention is to govern, although such construction may not in all respects agree with the letter of the statute. *Plowd. Rep.*, 205. Constructions of statutes are to be made of the whole acts according to the intent of the makers, and so sometimes are to be expounded against the letter to preserve the intent." *The King vs. The Bishop of London*, 1 *Show.*, 491 ; *Bac. Ab. Tit. Statute (I) pl. 5 ,. Sir Wm. Jones' Reps.*, 105. "The meaning of the words of an act of Parliament is to be ascertained from the *subject* to which it refers." 3 *Bing.*, 193, *per Best, Ch J.* "The reason and object of a statute are a clue to its true meaning." *Dwarris on Stat.*, 696.

A Massachusetts statute declared all usurious mortgages *utterly void*. In deciding a case arising under this statute the Court in *Green vs. Kemp* say : "Although by the statute of 1793 all mortgages on usurious considerations are declared to be utterly void, yet it never could have been intended that a stranger might enter on the mortgagee or commit a trespass on the land and justify himself under the statute when all parties interested in the title should be disposed to acquiesce in the contract. The statute must have a reasonable construction and in conformity to its general object, which was to protect debtors from the enforcement of unconscionable demands. A mortgage on a usurious consideration is therefore void only as against the mortgagor and those who may lawfully hold the estate under him."

When a statute gave treble damages against any person who should commit waste on land pending a suit for its recovery, the Court held that the act did not apply to a party wholly ignorant that any suit was pending, saying : "We can hardly suppose the Legislature intended to punish so severely a trespasser wholly ignorant of the pending of the suit. The statute is highly penal

and should therefore be limited in its application to the object the Legislature had in view." *Reed vs. Davis et al.*, 8 *Pick.*, 516, 517. The statute of Massachusetts exempts from execution among other things " one swine." The question being whether under the statute a swine when killed is protected from execution, Parker, Ch. J., in delivering the opinion of the Court, says : " The question presented in this case is more curious than difficult, for if we are to be governed at all by the manifest intention of the Legislature in making the exemption of a swine from liability to attachment or execution, we must give the exemption effect in the present instance. What could have been intended but the sustenance of a poor family by the exemption ? To give the strict construction contended for on the part of the defendant, would be to convert the intended benefit into an injury, for the swine would be protected until it became fit for food and then be at the mercy of the creditor.

" It is said that statutes in derogation of the common law are to be construed strictly. This is true, but they are also to be construed sensibly, and with a view to the object aimed at by the Legislature." *Gibson vs. Jenny*, 15 *Mass.*, 205. And see also— *Hart vs. Cleis*, 8 *John.*, 41 ; *U. S. vs. Fisher*, 2 *Cranch.*, 386 ; *McDermut et al. vs. Lorillard*, 1 *Edw.*, 273 ; *Donnell vs. Hall*, 4 *Com.*, 140 ; *Edwards vs. Dick*, 4 *B. & Ald.*, 212 ; *Simpson vs. Unwin*, 3 *B. & Adol.*, 134 ; *Atkinson vs. Fell*, 5 *Mawle & S.*, 240–41 ; *Wilbur vs. Crane*, 13 *Pick.*, 284 ; *Pease vs. Whitney et al.*, 5 *Mass.*, 380 ; *Murray's Lessees vs. Baker*, 3 *Wheaton*, 541 ; 1 *Black. Com.*, 60–61–87 ; 1 *Kent's Com.*, 460–2 ; 9 *Bac. Ab.*, (*Bouv. Ed.*,) 246–7–8, (*Title Statute I, 5 and* 6) ; *Lieber's Hermeneutics*, 144, *id.* 168 ; *Bristol Hospital vs. Norton*, 11 *M. & W.*, 928 ; *Turner vs. S. & R. Railway Co.*, 10 *M. & W.*, 434 ; *The King vs. Hall*, 1 *Barn. & Cress.*, 136–7 ; *Matteson vs. Hurb*, 14 *Com. Bench R.*, 385 ; *Abley vs. Dale*, 11 *Com. Bench R.*, 390 ; *McDougall vs. Paterson*, *Id.*, 769 ; *Warburton vs. Loveland*, 1 *Hudson & Brooke*, 648.

The rule deducible from these authorities would seem to be this : when the literal interpretation of an instrument involves any

absurdity, contradiction, injustice, or extreme hardship, the courts may deviate a little from the received sense and literal meaning of the words, and interpret the instrument in accordance with what may appear to have been the intention and meaning of its framers, and the real intention, when accurately ascertained, must in all cases prevail over the literal sense of the terms.   This rule should certainly be applied with much caution, for while it is doubtless true that in the interpretation of constitutions, statutes, or other written instruments. by the courts, a strict adherence to the mere letter would render our system practically intolerable, yet a loose and careless mode of interpretation is attended with the most serious dangers.   The rules applicable in the construction of constitutions are not different in this respect from those that govern in the construction of statutes.   *Sedgwick on Stat. and Con. Law*, 491–2–3.

In seeking for the intention of the Legislature, there are certain rules that have been accumulated by the experience and ratified by the approbation of ages, which we may safely follow, for that rule or law that has been tried by time has the highest possible evidence in its favor.

Blackstone in his Commentaries, *Vol.* 1, *page* 60, says :   "The fairest and most natural method to interpret the will of the legislator, is by exploring his intention at the time when the law was made by signs the most natural and probable, and these signs are either the words, the context, the subject matter, the effects and consequences, or the spirit and reason of the law."   *   *   *

"As to the effects and consequences, the rule is that where the words bear either none or very absurd signification if literally understood, we must a little deviate from the received sense of them. *   *   *   But lastly, the most universal and effectual way of discovering the true meaning of a law, when the words are ambiguous, is by considering the *reason* and *spirit* of it, or the cause which moved the legislator to enact it."

The illustration given under this last rule, shows plainly that its application is not to be confined to those cases where the language literally understood conveys no definite meaning, but on the con-

trary that it should also be applied in cases where the words, according to their literal signification, convey a definite meaning; but one which is evidently not in accordance with the *reason* and *spirit* of the law. *See also* 1 *Black. Com.*, 87.

Let us apply these cardinal rules of interpretation to this case.

Before the enactment of our constitution it was a ground of general complaint throughout the territory, that the Legislature frequently changed county lines and removed county seats against the will and contrary to the interest of those to be immediately affected thereby.

By the section of the constitution above quoted, perhaps it was intended to provide a remedy for this evil. At any rate it was manifestly the intention of the constitutional convention by this section, to forbid such removal or change except when sanctioned by the electors of the counties to be immediately affected, and it is also manifest that the convention did not by this section intend to withhold from the Legislature the power to make such change or removal, when desired by the electors of such counties. The section, therefore, seems to have been inserted in the constitution solely for the benefit of the counties to be affected by the change or removal; their interest only being guarded by it, and their will being the only restraint on the power of the Legislature.

A literal construction of the above quoted section as we have seen, involves great hardship and absurdity, and therefore, according to the rule of interpretation above quoted, we should a little deviate from such construction.

The *reason* and *spirit* of this constitutional provision, we have also seen, is not to forbid or render difficult or impracticable the change of county lines or removal of county seats, except when such change or removal is not desired by the counties to be immediately affected; but the construction claimed by the plaintiff would make such change impracticable at least in many cases, and very difficult and expensive in all. Such construction, therefore, though in accordance with the letter, is repugnant to the spirit and meaning of the constitution.

It is to be observed that the constitution requires such law to be

submitted to the electors at a "*general election.*"    The returns of the officers show the actual number of persons present at such election *voting on any question.*    As a general rule it is the duty as well as the privilege of every elector to attend and vote at such election.

The law presumes that every citizen does his duty, and in the eye of the law those present and voting at such election constitute the electors of the county.

This construction effectuates the purpose of the framers of said section, and makes it speak a sensible and consistent language, and we think therefore it is the true one.

The meaning of particular words in statutes as well as in other instruments, is to be found not so much in the strict etymological propriety of language nor even in popular use, as in the subject or occasion on which they are used, and the object that is intended to be attained.    *R. vs. Hill,* 1 *B. & C.,* 123–136.

No reason was here given why an absolute majority should be required, nor has a precedent been cited of a single instance in any State, where such absolute majority is required, and we think no such reason could be given or precedent cited.

We have only been able to find two cases where Courts have construed language substantially the same as that of this section of our constitution, and neither of these cases sanctions the construction claimed by plaintiff.

In Tennessee an act of the Legislature provided as follows: "That neither of the said County Courts shall so take stock (of a R. R. Co.) until the question of the taking of the same shall first have been submitted to the voters of the county which it is proposed shall subscribe stock, and a majority of such voters shall have decided in favor of taking the stock proposed," and farther, "that whenever a majority of the voters of either of the above named counties shall decide in favor of the proposition that the county shall take the stock proposed, it shall be the duty of the County Court," &c.    The Court in construing this language say: "The question made is whether this act requires a majority of all the legal voters residing in the county at the time of the election,

or only a majority of those who may attend the polls and actually vote. We are referred to the latest state and county elections to show the number of votes in the county, and then to the vote on this question to prove that the number of affirmative votes fall very far short of a majority of the legal voters of the county, though they exceed by several hundred the negative votes. How can we know how many legal voters there are in a county at any given time? We can not judicially know it. If it were proven that the vote was much larger at the last preceding political election, or by the last census by the official returns, or the examination of the witnesses, it would only be a circumstance, certainly not conclusive that such was the case at the time of the election.

But we put our decision on that question on a more fixed and stable ground. When a question or an election is put to the people and is made to depend on the vote of a majority, there can be no other test of the number entitled to vote but the ballot box. If in fact there be some or many who do not attend and exercise the privilege of voting it must be presumed that they concur with the majority who do attend, if indeed they can be known at all to have an existence. Certainly it would be competent for the Legislature to prescribe a different rule. But when they simply refer a question to the decision of a majority of the ' voters of a county,' it cannot be understood that they mean any thing more than those who see fit to exercise the privilege. Great inconvenience would result from the opposite rule. Suppose the vote should be very close, one, two, or a dozen majority one way or the other, how could the fact be ascertained but by the box of the exact number entitled to vote. It cannot be presumed that this or any other question submitted to the people was intended to be involved in such embarrassment." *Louisville and Nashville R. R. Co. v. Co. Court of Davison Co.*, 1 *Smeed's Rep.* 690.

In *People ex rel. Mitchell vs. Warfield*, 2 *Ill.* 159, Court say : " The law for the relocation of the county seat of Saline County, under which the election was held, was not as broad as the requirements of the constitution authorizing a relocation of county seats. That provision requires that a majority of the voters of

the county shall vote for the change. The law only requires the clerk to canvass the votes cast on the question of relocation, and certify the result, without regard to other votes cast at the same election. Beyond this in that certificate he is not authorized to go. Therefore under that law he can give no certificate which will afford legal evidence that a majority of the voters of the county have voted for one place or the other. His certificate, therefore, cannot afford legal evidence that the county seat has been changed under the provisions of the constitution.   *   *   * The statute itself can not be sustained under the constitution if we adhere to its literal expressions, for it requires in order to re-locate the county seat but a majority of the votes cast on the question of relocation, whereas the constitution goes farther and requires a majority of the voters of the county. The law may be sustained by reading it in the light of the constitution and construe it as giving effect to the affirmative vote, when such affirmative vote is by a majority of the legal voters of the county. The Legislature may have assumed, and doubtless did, that all would vote on the question, and such is the practical effect if we count the votes in the negative, which are silent on the subject. This portion of the constitution must receive a practical construction. We understand it to assume—and such we believe was the understanding of its framers—that the voters of the county referred to were the voters who should vote at the election authorized by it. If we go beyond this and inquire whether there were other voters of the county who were detained from the election by absence or sickness or voluntarily absented themselves from the polls, we should introduce an interminable inquiry and invite contests in elections of the most embarrassing and baneful character, if we did not destroy all of the practical benefits of laws passed under these provisions of the constitution.

"We hold, therefore, that a majority of the legal votes cast at this election, is sufficient to determine the question of a re-location of the county seat."

The plaintiff's counsel claims that his view of the question is supported by section 2 of said article of the constitution, which is

vol. x.—17

in the following language : ."The Legislature may organize any city into a separate county when it has attained a population of twenty thousand inhabitants, without reference to geographical extent, when a majority of the electors of the county in which such city may be situated voting thereon shall be in favor of a separate organization." He argues that the difference in phraseology shows a difference in meaning. The difference in the language of these sections is quite apparent, (so also is the difference in meaning,) but the inference therefrom as to the proper construc-·tion of section 1 is not legitimate. Section 2 requires only a majority of those voting on the particular question submitted under that section. Section 1 requires a majority of those voting at the *general election* at which the particular question is submitted. For illustration : at a general election a law is submitted for adoption or rejection. In the county in which such law is voted on, 2,000 votes are polled, but only 1200 on the question of the adoption of said law.

If the law is submitted under section 1, a constitutional majority would be at least 1,001; if submitted under section 2, 601 would be a constitutional majority.

It is also urged that the debates in the convention that framed the constitution, show that the construction claimed by plaintiff is the correct one.

If such debates could ever properly be resorted to as aids in interpretation, it seems quite obvious that such rule could not properly be followed in this case. The convention that framed this constitution divided on the first day of the session, forming two organizations, and afterward a joint committee of each re-·ported a constitution that each wing adopted, and which is now the constitution of our State. As well might we resort to the debates in a committee room, as to the debates of either wing of said convention to show what was meant by the language used in the constitution. But we think such debates should not influence a Court in expounding a constitution in any case. *See Eakin vs. Rawb*, 12 *Serg. & Rawl.*, 352 ; 3 *How. U. S. R.*, 1 ; *Sedgwick on Stat. and Con. Law*, 489; *Ib.*, 241; *Bank of Pennsylvania vs.*

*Commonwealth,* 7 *Penn. State Reps.,* 144; *The Southwark Bank vs. The Commonwealth,* 26 *Penn. State Reps.,* 446.

Even if the plaintiff's position was correct as to the construction of this section, the demurrer was well taken. It will be observed that the election was held on the 3d day of November, and the notice of contest was drawn up and verified on the 3d day of December, one month after the election. The plaintiff does not allege ·directly or indirectly that there were *at the date of the election* in said county any greater number of electors than actually voted, or at least that the number of those not voting would have changed the result of the vote (even according to his construction of the constitution,) on the question of the removal of the county seat.

It appears that there were 209 votes cast for the removal—146 against it—making in all 355. Plaintiff alleges that "there are" (were at the date of notice,) in the county over 486. An increase of 131 in the voting population of a county in one month is not unprecedented in Minnesota.

The plaintiff's allegation, therefore, does not make a case for him according to his own interpretation of the constitution.

The judgment of the Court below is reversed and cause remanded for farther proceedings.

BERRY, J.—*Dissenting.*—There are several doctrines advanced by the majority of the Court in the foregoing opinion to which I find myself unable to assent. Two only will be particularly referred to, and that briefly. In the first place, I dissent from the position that a valid election can be held without the use of poll lists.

It is true that under our system of overnment the right of suffrage is one of great value and importance. But it is not like the right to breathe. It is a right conferred and regulated by law, either organic or statutory. And while it is of great importance to the individual elector that in the exercise and enjoyment of this right he should not be embarrassed by the requirement of useless forms, it is just as important to the rest of the community

that he should exercise his right in such manner as to ensure purity of elections according to some general and practical rule. The Legislature of this State has determined that the registration of persons entitled to vote and the use of poll lists at elections are proper and necessary regulations of the exercise of the right of suffrage. And, in my judgment, for this Court to say that these regulations are not necessary to be observed—that they are merely directory—that an election is as good and valid without them as with them, is virtually to override the express will of the Legislature. It is equivalent to saying to the Legislature that notwithstanding you deem such requirements necessary to protect the ballot box from fraud, we think otherwise, and that too when the subject is one of purely legislative cognizance. It is said that in the interpretation of laws we are to look for the *intention* of the law-maker. Can it be contended that when the Legislature for the very purpose of preventing frauds, and affording facilities for their detection, have prescribed certain express and explicit rules, in accordance with which elections shall be conducted, that it was the *intention* to make the observance of those rules a matter of indifference? Or that an election conducted in entire disregard of such rules should be as valid to all intents and purposes as one which complies strictly with the law? I think not.

I also differ with the majority of the Court as to the construction of that part of the constitution relating to proceedings of this nature. *Sec.* 1, *Art.* 11, declares that " all laws  *  *  *  for removing county seats shall, before taking effect, be submitted to the electors of the county to be affected thereby,  *  *  *  and be adopted by a majority of such electors."

The plain natural meaning of this provision is that the law must be adopted by a majority of the *actual electors* of the county, and I am unable to agree with the reasoning through which the majority of the Court arrive at the conclusion that the clause " *a majority of such electors* " means a majority of those who *vote* at the election. If it be true, as claimed, that the law presumes " that every citizen does his duty," it occurs to me that this principle (if it have any existence) could hardly apply here. If the

exercise of the right of suffrage be a duty, it is rather a moral than a legal duty; and as a matter of fact any presumption that every elector who is entitled to vote does vote, is against all experience.

A studied difference of language implies difference of intention, especially when the passages of an instrument in which the difference occurs are contiguous. There are several places in the constitution in which it is provided that certain things may be accomplished by vote of a majority of the electors *voting thereon.* One of these is referred to in the majority opinion in this case. It relates to change of county lines, and is found in the section immediately succeeding the section under consideration. See also *Secs.* 1, 2, *Art.* 14; *Schedule, Secs.* 18, 22. But a careful inspection of the constitution will show that the section in question furnishes the *only* instance in which it is required that the proposition submitted shall be adopted by a majority *of the electors.* This difference appears to me to be significant. But it is urged that to put this construction upon the constitution would be to render it inoperative in this respect.

*That* is a matter to be addressed to the people who make constitutions. If it be true that in adopting the constitution they have adopted a provision which will not work in practice, it would not be the first mistake of the kind on record. And even if the doubtful paternity of our constitution would render any reference to the constitutional debates illegitimate as *authority* upon the question of construction, it is certainly proper to refer to them for the purpose of showing that it was possible for some members of the convention to put the construction for which I contend on this provision without being aware that it would render it of no practical value, and to show that it might possibly have been the *intention* to make the removal of a county seat dependent on the will of a majority of *all the electors* of the county affected, without looking ahead far enough to see that there was no way to ascertain who or how many all the electors were. And an examination of these debates (*see Minn. Con. Debates,* 472) shows that the position taken while the matter was under discussion in the

Sibley Convention, and which seems to have been acquiesced in, was that this provision required not only a "majority of all the 'electors who vote, *but of all the electors of the county.*"

If it be admitted that a fair and natural interpretation of this part of the constitution would render it inoperative, I should much rather rest on this conclusion than to attempt to make it operative by a *forced* construction, or by the interpolation of words which were not inserted by its framers, and which would seem to have been left out by design. The only effect of the adoption of my view in this case would be to render county seats immoveable, which would be a light misfortune compared with the damage done to the constitution by a latitudinarian construction. If the practical immoveability of county seats be oppressive, the constitution can be amended.

But I am unable to perceive that even in my view of the matter, as above expressed, the part of the constitution under examination would necessarily be inoperative. It is probably quite true that at the time when the constitution was adopted no way was provided for ascertaining officially the number of legal voters. But that matter was for all purposes under the control of the Legislature. It was in their power to establish by express legislation a reasonable rule of evidence on the subject. I think there is no difficulty now. For it is made the sworn duty of the judges of election to make out a list of electors, and this list is subject to revision and correction down to the hour when the polls are opened. Under the familiar rule by which a public officer is presumed to have done his duty, these lists, made as they are for the very purpose of ascertaining who is entitled to vote, and that too by authority of law, would be at least *prima facie* evidence of the number of voters. And even without any such evidence as the lists furnish, it is clearly possible and practicable to ascertain the number of voters in a given county, though the attempt may be attended with much labor and inconvenience. And it will be found that in some other cases our Legislature have enacted laws which are based upon the practicability and necessity of ascertaining the actual number of voters within a given district, and

that too without the opportunity of ascertaining this number by the holding of an election or by a reference to poll lists. *Laws* 1862, *chap.* 67, *p.* 137; *Id.*, *chap.* 68, *sec.* 1, *p.* 138.

It is true that there are abundant authorities which give great latitude to judicial interpretation. Many of these are cited in the majority opinion in this case. Many of them are commented on by Mr. Sedgwick, in his work on Constitutional and Statutory Law, and the general condemnation which he passes upon them is supported with great force of argument. *See chap.* 7, *Sedg. on Con. and Stat. Law.*

And I conclude by quoting on this point a few sentences from the opinion delivered by that distinguished jurist, Mr. Justice Bronson, in *Oakley vs. Aspinwall*, 3 *Com.*, 547. "My rule has ever been," he says, "to follow the fundamental law as it is written, regardless of consequences. If the law does not work well the people can amend it, and inconveniences can be borne long enough to await that process. But if the Legislature or the Courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the Legislature or the Judiciary in enlarging the powers of government, opens the door for another, which will be sure to follow; and so the process goes on until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them."