## POWER OF COUNCIL TO AUTHORIZE EXCLUSIVE OCCUPATION OF STREETS.

[Superior Court of Cincinnati, General Term.]

THE CITY OF CINCINNATI v. THE LOUISVILLE & NASHVILLE RAIL-
ROAD COMPANY.

Decided, June 16, 1906.

*Municipal Corporations—Overhead Railway Structures in Streets—No Power
in Council to Authorize, When—Could Not be Conferred by an Obscure
Amendment to a Penal Statute—Statutes Relating to Bridge Companies
and Grade Crossings Not Applicable—Application of the Maxim,
"Expressio Unius Est Exclusio Alterius"—Sections 3283, 2640, 6921,
1536-100, 1536-102 and 3337-1 as Amended.*

1. There is an entire absence of power in council, under the statutes as
they exist today, to authorize the erection of any structure, abut-
ment or support in a public way, which will necessarily prevent a
joint use by the public of the part so occupied.
2. Section 3337-1 is a statute penal in its nature, and the maxim *expressio
unius est exclusio alterius* can not be invoked in order to derive there-
from power vesting in the municipal corporation the right to grant
to railroads the exclusive use of the public streets.
3. But even if the power were lodged by the statutes in council to grant
some use of the city streets to railroads for placing piers, posts
or supports therein, the power could not be abused by council, and
if it is abused in such a way as to interfere with the ordinary rights
of the public in and to the ordinary use of such streets, a court of
equity will interpose by injunction.

HOFFHEIMER, J.

This was an action brought by the City of Cincinnati, through
its solicitor, under and by virtue of Section 1777, Revised Stat-
utes, whereby it is made the duty of the solicitor to apply, in the
name of the corporation, for an order of injunction to prevent
the abuse of corporate powers of the city, or the execution or per-
formance of a contract made in behalf of the corporation which
is in contravention of law.

The petition, or rather, amended petition, is very lengthy,
and it is not necessary to set out the claims made therein, as it
will fully appear in the course of the opinion herein just what it
is that city asks that the L. & N. Railroad Company be en-
joined against.

Upon application by the city, a temporary restraining order was allowed, and the hearing now is upon defendant's motion to dissolve the same. The cause is one of no little importance to both parties—important to the railroad company, because the contract for the construction of the viaduct, the erection of which is now enjoined, has been let by it, and the steel necessary has all been ordered and shipped. This contract alone involves an expenditure of $175,000; $400,000 has been expended by defendant railroad company for right of way over private property; $562,000 have been devoted to securing property for terminal facilities, and a bridge across the Ohio river has been purchased by the railroad company. The structure now involved is the connecting link between said bridge and the approach to the proposed terminals in the city. The case is also one of extreme importance to the public, because it involves the rights of the public in and to the public grounds and streets which this proposed structure, if completed, must necessarily touch upon. The hearing involves a consideration of the legal effect of two ordinances of the city council which purport to authorize the defendant railway company to construct a viaduct or overhead structure for railroad purposes across what is known as the public landing and streets of the City of Cincinnati.

The contention of the city may be summed up thus:

"1. That council has no power to authorize the erection of any structure or abutments in the public ways which necessarily prevent a joint use by the public of the part so occupied.

"2. That if council has power to authorize some occupation of the public way or streets by any such structure or abutments, that council has no power to authorize structures or abutments of a size, character, number and height which would, in fact, impede, interfere with and obstruct public travel."

The history of the case reveals that, on November 7, 1904, the council of the City of Cincinnati passed an ordinance No. 643, "Agreeing upon the manner, terms and conditions upon which the L. & N. Railroad Company may use, occupy and cross over, along and upon the streets, alleys and public grounds of the City of Cincinnati, for the purposes of constructing and maintaining and operating an extension of its steam railroad from a point at or near pier No. 1, on the north side of the Newport & Cin-

cinnati Bridge, in the City of Cincinnati, to the site of the proposed depot south of Water street, between Vine and Plum streets in said city.''

To this ordinance a plat was attached showing the exact location of the viaduct, which plat was made a part of the ordinance. This ordinance was duly accepted by the railroad company. On August 28, 1905, council passed an ordinance amending Section 1 of this ordinance, setting out specifically the exact character, location and height of the viaduct in all places where it touched upon public streets or grounds. Section 2 of the original ordinance contained a provision to the effect that the elevated structure ''shall be of such height and character as not to interfere with the ordinary travel over such street, alley or public ground.'' The second, or amended, ordinance, passed August 28, 1905, amended Section 1 of the original ordinance, prescribing, as I have already stated, minutely and specifically the exact character, location and height of the viaduct wherever it appeared the same touched on public streets or ground. It provided that on the public landing there should be no longitudinal bracing, and that the minimum vertical clearance should be twelve feet; that the bents should have vertical posts nine feet apart transversely from center to center; that the general length of the span should be twenty-five feet from center to center of bents, but that upon the curved portion at the east there should be six spans a half foot shorter, and upon the curved portion to the west there should be two spans six inches shorter. The evidence shows, in addition, that a concrete wheel guard three feet in diameter is also to be placed at the base of each bent, thus reducing the width of the span, on the ground surface, to twenty-two and one-half feet, and that eighteen inches above the ground and clear of the concrete wheel guard the maximum width between bents would be twenty-three and one-half feet. The evidence further shows that, by these plans, the vertical clearance will attain the minimum prescribed at the extreme east and west, and that the spans other than those at the extreme east and west of the landing will have a greater vertical clearance, the maximum being about the center of the public landing, where the clearance will be thirteen feet and ten inches, and that twenty-seven spans will have a vertical clearance of more than thirteen feet.

From this description one may have a general understanding of the nature of the structure that the railroad proposes to erect along the public landing and at the end of Broadway, Sycamore and Walnut streets, if such streets were extended.

If we were to concede that the council had the power to grant a railroad company the right to place such bents or stays or supports for its proposed structure on the public landing or at the head of the streets named in the petition, if extended to the river, it would be an abuse of power, nevertheless, if, in granting such right the effect would be to cut off or materially interfere with the ordinary public travel or the public's free and uninterrupted use of such part of its streets or highways.

By virtue of Section 2640, Revised Statutes, council is required to keep the streets open and in repair and free from nuisance. Obviously it can not denude itself of such power and grant a railroad company the right to build a structure according to particular plans or specifications, where it clearly appears such structure would, in its very nature, be an exclusive use, or would be a menace, hindrance or detriment to the dominant right of the public in the use of its streets or public grounds. The question, then, would be, if council had any power to permit the use of the public streets or public landing as proposed, does the evidence show that the structure as proposed is of such character as will materially interfere with the ordinary public travel or use of such streets?

Several days were given over to hearing testimony on this point. Citizens, members of the Chamber of Commerce, were heard, as were also a great number of boss teamsters and drivers —men who are and have been accustomed to hauling on the public landing. And there was also quite an array of civil engineers. The proposed location of this viaduct, the evidence shows, is on the crest, or apron, of the public landing. That is to say, it is to be located at or about the point, for the most part, where the substantial grade begins. In going up and down the public landing, as a general thing, teams are made to go obliquely, because of the grade of the landing. Thus we have presented for consideration the practicability of teams, say of two, four, six or more horses, drawing heavy loads, wagons and loads of varying height and breadth, being able to clear the

structure under all conditions, including those of ice and sleet. Then there is another method of pulling what may be said to be a dead weight, straight up the hill; that is to say, not going on a slant, or obliquely, with teams varying in number and with wagons and loads of different sizes and height. And again we are met with a consideration of the practicability of the ordinary driver of such teams being able to hit the bull's eye, as it were, and being able to pass under and through the clearance in safety.

The opinions of several engineers, who undertake to show, by mathematical demonstrations, that it would be both feasible and practicable for drivers in charge of teams attached to heavily laden wagons to drive through the clearances; and the opinions of the ordinary merchant, or business man, with little or no practical experience in driving teams or horses on the public landing, is of little, if any, value when placed alongside of the opinions of boss teamsters and the experienced drivers, men who for years have been daily engaged in the work of either super-intending or actually driving teams, with great loads, up and down the public places in question. The latter are the men best qualified to speak, and no one could hear the testimony of these men and not be convinced, and I so find the facts to be, that the structure, as it is proposed to be built in accordance with the amended ordinance of council, would not only seriously inter-fere with the public's use of these streets and grounds, but, under some conditions, as one witness put it, might be dangerous.

If, then, council had the power to grant the railroad the right to use the public streets by giving it the right or permission to erect stays or supports therein, surely a court of equity would prevent the council—"the trustees of the public"—from abusing the power, or exercising the power in such a manner as to ma-terially interfere with the public in its use and enjoyment of such streets and public grounds. If there were no other reason for continuing the injunction heretofore granted because of this abuse of power alone, it would be the duty of this court to in-terfere. For the authorization of such a use by the railroad company would be the outgrowth of an unlawful use or exercise of power on behalf of council, even if we were to assume that it had the power to permit some sort of stay or support in the public

ground.   For such an abuse the courts have ample power to intervene.   See *Gas Company v. Elyria,* 57 O. S., 374.

But there is a more cogent reason for enjoining this work. Council was utterly without any power to grant the defendant railroad an exclusive use of the public streets for the purpose of erecting its structures, stays or supports.   Whatever power council has must have been expressly granted by the Legislature representing the sovereign power of the state.   We must, therefore, look to the statutes.

Section 3283 of the Revised Statutes is as follows:

"If it be necessary, in the location of any part of a railroad, to occupy any public road, street, alley, way or ground of any kind, or any part thereof, the municipal or other corporation, or public officers or authorities, owning or having charge thereof, and the company, may agree upon the manner, terms and conditions upon which the same may be used or occupied."

Our Supreme Court has had occasion to interpret this section, and, in *Railway Company* v. *Elyria,* 69 O. S., 414, it was held:

"Syllabus 3.   Where a railroad company, for the purpose of supporting its overhead crossing of a public city or village street, erects and maintains abutments which occupy a portion of a street, excluding the public therefrom, and claims the right to do so under contract made with the municipal council, it must appear that the council was authorized by statute, in express terms, or by clear implication therefrom, to make such contract; a mere general legislation authorizing the railroad company to occupy a street for the purposes of its road, is insufficient for such permanent and exclusive use."   *Ravenna* v. *Pennsylvania Company,* 45 O. S., 118, approved and followed.

"Syllabus 4.   Section 3283, Revised Statutes, does not authorize a city or village council to agree with a railroad company for the permanent and exclusive occupation of a public street with abutments to support an overhead crossing of the railroad, nor can such occupation be rightly gained by means of appropriation. And if the company so occupying the street refuses to restore it to its former condition of usefulness to the public, it may be compelled to do so by mandatory injunction, without a right to compensation for the expense of removal."

The *exclusive* use to which the court was here referring unquestionably had reference to such portions of the public street

as were occupied by the piers or abutments of the railroad. It was the right of the public in and to such portions of the street so exclusively taken up by the railroad, to which the Supreme Court was addressing itself. Prior to the decision in the Elyria case, in *Railroad Company* v. *Defiance,* 52 O. S., 262, in considering rights alleged to have been granted to the railroad company under and by virtue of Section 3283, Revised Statutes, our Supreme Court had occasion to say:

"The powers conferred on municipal corporations with respect to the opening, improving and repairing of their streets and public ways, *are held in trust for public purposes,* and are continuing in their nature, to be exercised from time to time as the public interests may require; and they can not be granted away or relinquished or their exercise suspended or abridged except when and to the extent legislative authority is expressly given to do so; such authority is not given by Section 3283 of the Revised Statutes. Every grant in derogation of the right of the public. in the free and unobstructed use of the streets, and restrictive of the control of the proper agencies of the municipal body over them, or of the legitimate exercise of their powers in the public interest, will be construed strictly against the grantee and liberally in favor of the public, and never extended beyond its express terms when not indispensable to give effect to the grant."

And again, in *Zanesville* v. *Fannan,* 53 O. S., 605, the Supreme Court, speaking with reference to the powers and the duties of municipalities with reference to their streets, said:

"Any permanent obstruction or incumbrance in any street of a municipal corporation is made a nuisance by statute (Revised Statutes, 6921), which the municipal authorities are vested with the power and charged with the duty of removing (Revised Statutes, 1690, 1878, 1934 and 2640); and those powers and duties continue when the railroad company has placed its structures in a public street, whether they were so placed under permission granted by the municipality, or under an appropriation for that purpose. In neither event are the municipal authorities divested of their powers nor absolved from the performance of their duties. Nor does Section 3283 contemplate that the railroad company, in the use of a street for the purposes of its road, under a right acquired in either of the modes provided, may destroy the same, or create a nuisance therein. On the contrary, it contemplates that the company shall exercise its rights with proper regard to those of the public in the street, and that the street

and its uses by the public shall be preserved and protected with such additional use as may be necessary in the particular appropriation by the railroad, which is itself a means of public use. If the permission to occupy the street be granted by municipal authorities, they may and should prescribe such reasonable regulations and conditions as will prevent the creation of a nuisance and preserve and best protect the free and full use of the street by the public. And in proceedings to acquire the right by appropriation, it can not be assumed as a proper basis for the estimation of compensation for damage that the company will destroy the street or create nuisances therein."

The case of *The Wabash Railroad Company* v. *Defiance*, 52 O. S., 262, was subsequently affirmed by the Supreme Court of the United States (162 U. S., 88). And it was held that there could be no contract, under Section 3283, by the council with a railroad company to permit the permanent maintenance of its bridge. The effect of the grant was simply that of a licensee. The court said:

"The general principle that the legislative power of the city may control and improve its streets, and that such power, when duly exercised by ordinances, will override any license previously given by which control of a certain street has been surrendered to any individual or corporation, is so well established, both by the cases in this court and in the courts of the several states, that a reference to the leading authorities upon the subject is sufficient. Indeed, the right of a city to improve its streets by regrading, or otherwise, is something so essential to its growth and prosperity that the common council can no more denude itself of that right than it can of its power to legislate for the health, safety and morals of its inhabitants."

Thus we see that we have not only to consider Sections 2640, Revised Statutes, and 6921, Revised Statutes, when reading Section 3283, but we must bear in mind what our Supreme Court has said with reference to the extent of the power sought to be conferred upon council by Section 3283, Revised Statutes. The limitation placed upon the council's rights to agree as to the manner of occupancy is made clear by these authorities and by these sections, and it is apparent that the occupancy is limited to a *joint* occupancy, "unless the Legislature, representing the sovereignty of the state, empower the municipal councils to make

the larger grant and confer exclusive use.'' (Judge Price, 69 O. S., 414).

Was the ''larger grant'' conferred by the Legislature subsequent to the decision in the Elyria case? The railroad company, through its able counsel, ingeniously argues that such power has been granted, and that the Elyria case, *supra*, no longer controls; that since the decision in that case the statutes have been so modified that the municipal council is now vested with the power to permit the erection of stays or supports or abutments in any public street of any size or width. This express grant of power to council appears from an amendment, it is claimed, to Section 3337-1, Revised Statutes; and the amendment from which this power is deduced is in the following words (see 97 O. L., page 301):

''Unless placing and maintaining of the same be authorized by the city in which such crossing is situated, by ordinance duly passed.''

Prior to this amendment Section 3337-1 (April 3, 1889, 86 O. L., 197) read as follows:

*''Be it enacted by the General Assembly of the State of Ohio,* That it shall be unlawful for any person, company or corporation owning or operating any railroad crossing, or that may hereafter cross, over and above any street less than seventy feet in width, in any city in this state, at an elevation above such street sufficient to permit persons to pass and repass along such street beneath such railroad crossing, to place or cause to be placed, or to suffer or permit to be or remain in such street beneath such railroad crossing or bridge, any pier or other stay or support for such crossing or bridge, or to suffer or permit any such railroad crossing or bridge to be or remain in such condition that any iron, coal or other hard substance, or any fluid or noisome matter may fall or drop from or through any such crossing or bridge upon persons traveling or passing beneath the same; and any such person, company or corporation, owning or operating any such railroad, failing to comply with the requirements of, or violating any of the provisions of this section, shall, for each and every day during the continuance of such failure or violation and on account thereof, *forfeit and pay to such city the sum of* $100, *which may be recovered in a civil action in the name of such city,* against the owner or operator of such railroad, or both, as the city may elect, and thereafter like recovery may be had in such manner for subsequent failures and violations aforesaid.''

Section 2. This section prohibits switching, constructing, and so forth.

Prior to the passage of the amendment above set forth, the railroad company contends that there was, by virtue of this statute, statutory power in council to permit a railroad to cross a public street or other ground, of any width, with a single restriction that in case the street crossed was less than seventy feet in width, no support might be placed therein. This power, it is urged, is clearly ascertained by reading Section 3283, Revised Statutes, and Section 28 of the Municipal Code, 96 O. L., 31 (which is the section giving to the council whatever power 3283 confers), and the act of April 3, 1889 (86 O. L., 187), together. That council is thus vested with the power referred to, it is urged, is the result of the application of the maxim *"Expressio unius est exclusio alterius."* 2 Lewis Southerland on Statutory Construction, Section 491; *Brown* v. *Maryland,* 12 Wheaton, 419; *Hankins* v. *The People,* 106 Ill., 628; *Manning, Bowman & Company* v. *Keenan,* 73 N. Y., 45.

And it is further contended that since the amendment of April 23, 1904, 97 O. L., 301, *supra,* the municipal council may now agree with a railroad to cross any public street with an overhead structure, and to place supports therein, no matter whether such street be more than seventy feet in width, or less. But such construction is a very strained one, and at the very best could only leave the court in doubt. Notwithstanding Tindall, C. J., and Chief-Justice Marshall and other eminent judges and writers, have long since recognized the value of the maxim *expressio unius est exclusio alterius* in the interpretation of statutes, it must not be forgotten that the rule is not of universal application; and/all text writers agree that extreme caution must be exercised in its use. Endlich on Interpretation of Statutes, Section 398; Broom's Legal Maxims, page 653; Bishop, W. L., Section 249a; *Taylor* v. *Taylor,* 10 Minn., 107-113.

Approaching, then, the statute which is said to be the source of council's power, what do we find it to be as to its general terms and scope? The act itself is entitled, both in the original act and in the act as amended, "An Act to Protect Travelers on Streets and Highways." It is an act penal in its nature, and

provides a penalty for the doing of that which it distinctly says shall be unlawful. It confers no power on a municipal corporation, and sought to confer none. It did, however, provide, by amendment, a means and a manner in which a railroad company might be exonerated from the penalty. That is to say, in the event that the placing and maintenance of the structure be authorized by the city, then no such penalty could be recovered by the city. But it can scarcely be argued that the effect of this amendment was to exonerate the defendant company from the penalty and at the same time legalize the structure.

And while we are thus straining at a construction that might show a grant of power, it would be well to bear in mind and keep before us the kind of authorization that our Supreme Court has said is required. "Moreover, to confer the exclusive use, the legislation must be express and clear to that effect, as held in *Ravenna* v. *Pennsylvania Company*, 45 O. S., 118." *L. S. & M. S. Railway Company* v. *Elyria*, 69 O. S., 435.

And again, at page 43, Judge Price says:

"To go beyond a joint occupancy or use of the street, the statute must speak in clear and unmistakable language. There can be no authority in such cases by implication unless it is unmistakable. This court has held the substance of this doctrine on more than one occasion."

Surely, then, in view of such language, the maxim *expressio unius est exclusio alterius* can be of little avail, and more especially so when it is sought to use, as the basis of the grant of express power to a municipal council, a statute *penal* in its nature.

As is pointed out by counsel, the municipal code, in granting power, uses apt language to make the grant. Section 7 (1536-100) provides:

"All municipal corporations shall have the following general powers, and council may provide, by ordinance or resolution, for the exercise and enforcement of the same."

And Section 9 of the Code (1536-102) provides:

"All municipal corporations shall have the following special powers which shall be exercised in the manner hereinafter provided."

When, therefore, we consider the manner in which the Legislature vests municipal councils with power, it would seem highly improbable that the Legislature intended to grant so important a power as the power to grant to others the exclusive use of the streets and public grounds, by an obscure amendment to a penal statute.

If, however, it were still urged that the Legislature did so intend, from any aspect the alleged investiture of power would be attended with so much doubt that, in consonance with the rule prescribed in such cases, we would be compelled to resolve the doubt against the municipal corporation. *Bloom* v. *Xenia*, 32 O. S., 461.

"The power of a municipal corporation is strictly limited. It has that which is expressly granted or clearly implied and no more; and doubtful claims to power are resolved against it." *Mintern* v. *Larue*, 23 How., 435, cited in *Bloom* v. *Xenia*, at page 465.

While it is proper, in endeavoring to arrive at the legislative intent, to consider the statutes *in pari materia*, I may say that such statutes to which I have been referred afford no further light. Some of these acts relate purely to bridge companies, not to steam railroads; other acts relate to grade crossings; but a statute with reference to an ordinary grade crossing could be of no avail in showing the intention of the Legislature to permit a *transverse* crossing over and along the entire *length* of a street or public landing, as is attempted in the case at bar.

Furthermore, none of these statutes to which I am referred can have any possible bearing, as far as I can see, upon the intention of the Legislature to permit council to grant *exclusive* rights to a railroad in public streets. I am utterly unable, in view of the foregoing, to find any authority whatsoever in council, whereby it undertook to grant to defendant railroad company the right to erect the structure proposed as complained of in the plaintiff's petition, thereby granting defendant an exclusive use in the parts of the public grounds to be occupied by the bents or stays or supports.

I must, therefore, hold that these ordinances, in so far as they grant to the defendant the right to erect such structures in public streets and public grounds, are void.

The motion to dissolve the injunction must, therefore, be overruled, and I direct that the order of injunction herein be made perpetual against both defendants.

*Jesse Lowman,* City Solicitor, and *Walter A. DeCamp,* Assistant City Solicitor, for the city.

*Ellis G. Kinkead, H. Kenneth Rogers, C. B. Ellis, H. L. Stone,* for the defendant.