MIDWAY COMPANY v. FRANK W. EATON and Others.[1]

May 16, 1900.

Nos. 11,980—(150).

## Public Land—Location of Half-Breed Scrip—Secretary of the Interior.

By virtue of the act of congress of July 17, 1854 (10 St. 304), there was issued to one Orillie Moreau, a mixed blood of the Sioux nation, five pieces of what is known as "half-breed scrip"; one of these pieces, for 160 acres, being described as "No. 19 D."  This piece was located June 16, 1883, on unsurveyed lands in the Duluth district by one Eaton, who held a power of attorney executed and delivered by the recipient of the scrip and her husband,—she having married a man named Stram in the meantime,—which power authorized Eaton to locate the scrip, and to do all acts necessary to secure a permanent and bona fide location thereof.  After the land was surveyed, and on July 21, 1885, the location was adjusted at the local office to governmental subdivisions on the application of the attorney in fact.  In a contest instituted by one Hyde, who

[1] MIDWAY COMPANY v. FRANK W. EATON and Others.

May 16, 1900.

Nos. 12,016—213.

claimed the land under the pre-emption act, the commissioner of the general land office held the Stram entry unauthorized and invalid, and that the same should be cancelled and set aside. This decision was affirmed by the secretary of the interior February 18, 1889. Hyde's claim was disposed of adversely to him at the same time. The land was subsequently patented by the United States to one Hicks, under the homestead act, and Hicks' successors in interest brought this action to determine adverse claims against defendants, who assert ownership under the Stram entry. On findings of fact the court below held, as conclusions of law, that the plaintiff held the legal title to the land in trust for defendants, in certain undivided shares, and that said defendants were and are the owners thereof, and ordered judgment accordingly.

1. *Held*, that the secretary of the interior acted without the authority of law when he decided the Stram entry or location to be unauthorized and invalid, and for that reason affirmed the order of the commissioner cancelling the same.

2. *Held*, further, that the scripee, or her successors in interest, could not be deprived of their rights in the land by the assumption of a supervisory power by the officials in the land department, or by the issuance of a patent to another.

3. *Held*, that the findings were supported by the evidence, and justified the conclusions of law.

Action in the district court for St. Louis county to determine adverse claims to land. The case was tried before Moer, J., who found in favor of defendants. From an order denying a motion for a new trial, and also from a judgment entered pursuant to the findings, plaintiff appealed. Affirmed.

*Walter Ayers* and *P. H. Seymour*, for appellant.

Counsel cited the act of congress of July 17, 1854 (10 St. 304), giving the reasons for its passage with particular reference to the clause against the assignability of the scrip issued thereunder. For the construction placed upon the act by the land department of the United States: Hyde v. Eaton, 12 L. D. (Dep. Int.) 157; Allen v. Merrill, 8 L. D. 207; Allen v. Merrill, 12 L. D. 138; Felix v. Carroll (unreported), decided March 27, 1863; Murphy v. Jones (unreported), decided June 29, 1876; McGregor v. Quinn, 18 L. D. 368; Strong v. Pettijohn, 21 L. D. 111; Morgan v. Missoula, 21 L. D. 306; John W. Poe, 29 L. D. 309; 1 Lester, Land L. 628; 2 Lester, Land L. 369.

For the construction placed upon the act by the courts: U. S. v. Chapman, 5 Saw. 528; Rose v. Nevada, 73 Cal. 385; Monette v. Cratt, 7 Minn. 176 (234); Gilbert v. Thompson, 14 Minn. 414 (544); Coursolle v. Weyerhauser, 69 Minn. 328; Dole v. Wilson, 20 Minn. 308 (356). For the construction placed upon the act by the United States supreme court: Felix v. Patrick, 145 U. S. 317; Fee v. Brown, 162 U. S. 602; Carter v. Ruddy, 166 U. S. 493.

As to the relation of the federal government to the Indian and its policy of protecting the Indian from the results of his own improvidence: Cherokee Nation v. State of Georgia, 5 Pet. 1; Jones v. Meehan, 175 U. S. 1; Smith v. Stevens, 10 Wall. 321. As to the policy of the government with reference to unsurveyed lands: Lytle v. State, 9 How. 314; Buxton v. Traver, 130 U. S. 232; Atherton v. Fowler, 96 U. S. 513; Johnson v. Towsley, 13 Wall. 72; Webster v. Luther, 163 U. S. 331. As to restraints on alienation imposed by the pre-emption and homestead laws: Anderson v. Carkins, 135 U. S. 483; Myers v. Croft, 13 Wall. 291; Quinby v. Conlan, 104 U. S. 420. As to the duty of the land department to enforce the policy of the government relating to the disposal of public land and the supervisory power of the secretary of the interior: Knight v. U. S. Land Assn., 142 U. S. 161; Orchard v. Alexander, 157 U. S. 372; Michigan L. & L. Co. v. Rust, 168 U. S. 589; American Mort. Co. v. Hopper, 29 U. S. App. 12.

*J. L. Washburn, W. D. Bailey,* and *Towne & Harris,* for respondents.

COLLINS, J.[2]

Action to determine an adverse claim to three governmental subdivisions situated in St. Louis county. The court below found against plaintiff, the corporation, and ordered judgment in favor of the defendants, as owners of undivided interests. The appeal is from an order denying a new trial, and also from the judgment thereinafter entered.

This case is another chapter of the controversy which has been in progress since 1883, in the courts and in the interior department of the general government, over that well-known and very at-

[2] LEWIS, J., did not sit.

tractive section 30. The particular tracts here involved were referred to in the case of Bishop Iron Co. v. Hyde, 66 Minn. 24, 68 N. W. 95, recently affirmed in the supreme court of the United States,[2] as those upon which had been located, prior to the initiation of Hyde's claim, Sioux half-breed scrip No. 19 D, issued to a woman named Moreau, which location was contested by Hyde as therein set forth,—a contest which resulted disastrously to both parties; the secretary of the interior finally sustaining the decision of the commissioner of the general land office that the scrip location should be cancelled for noncompliance with the law, and that Hyde had no rights as a pre-emptor, because he had previously contracted to sell and convey to a third party a portion of the land he proposed to acquire.

In 1898 the land in question, a part only of that covered by the Moreau scrip, was patented by the United States under the homestead act to one Hicks, and the plaintiff's claim of title is derived from him. The defendants assert ownership through and under the scrip location; their position being that the same was unlawfully cancel.ed by the officials of the land department, that the scripee could not be deprived of rights obtained under the location or entry, that the patent subsequently issued to Hicks inured to the scripee's benefit, and that the former and the plaintiff, who purchased with notice, held the land in trust for defendants. It is this trust which the court below enforced through the judgment appealed from.

As we regard the case, the rights of the respective parties rest upon the legality of the rulings in the land department; the last being the affirmance by the then secretary of the interior of the order of cancellation, as made by the commissioner of the general land office August 4, 1888. This affirmance bore date February 18, 1889, and is unpublished. It was sustained by the successor in office of said secretary. See Hyde v. Eaton, 12 L. D. (Dep. Int.) 157. In the Hyde case much of the history of this contest in the department is related. The testimony was taken before the local land officers, who were of the opinion that the scrip entries were valid.

[2] 177 U. S. 281.

Certified copies of the testimony of the witnesses produced at this hearing were received in evidence in the court below. The written opinion of the local officers, and the findings made by them, if any, were not there presented. Nor were there introduced the findings of fact and conclusions of the commissioner as they appeared, undoubtedly, in his decision of August 4, 1888. But parts or all of these findings were recited in the decision of affirmance made by the secretary, of date February 18, 1889; a certified copy of the same having been received in evidence at the trial.

From this copy and other testimony it appears that on June 16, 1883, one Eaton, as attorney in fact for the half-breed, who had in the meantime married a man named Stram, and who will hereinafter be called Mrs. Stram, filed the scrip in question, with other pieces, upon tracts of unsurveyed land in the Duluth district. The necessary affidavits, with the powers of attorney, and diagrams to locate and identify the tracts, were also filed. All of the steps required by the rules and regulations of the land department seem to have been taken in due form. July 21, 1885, upon the application of the attorney in fact, scrip No. 19 D was adjusted by the local officers to the governmental subdivisions herein involved, and other subdivisions; the land having been surveyed by the authorities just previously. The Hyde contest was commenced the day before.

We now come to facts which, from the decision of the secretary, it appears were found by the commissioner in his decision affirmed by the secretary, as before stated:

(1) It was found that accompanying the scrip, and application to locate the same, was what purported to be the original power of attorney given May 25, 1883, by the scripee and her husband to Frank W. Eaton.; that with the application was an affidavit by said Eaton setting out that he, under said power of attorney, had caused to be built upon the tracts upon which the scrip was located a house fourteen by sixteen feet, one story high, of timber, covered with split shingles, with doors and windows; that he also had cleared one-half acre of land. And also setting forth:

(2) That said improvements were made under the personal direction of the scripee, and for her personal use and benefit.

(3) It was found by a clear preponderance of evidence that said Eaton, by virtue of his power of attorney, employed Edward Byrne to make the improvements upon the tracts in question, and that Byrne secured the services of Powers and Clement to assist him in the matter.

(4) That Eaton admits that the power of attorney under which he acted was executed by the scripee in blank; that he never saw the scripee until March 31, 1886, never saw the land, and did not know whether said scripee ever saw it or not; that the deed of confirmation by the scripee appears, so far as she and Eaton are concerned, to remove any objection to the acts previously performed by the latter under and by virtue of his said power of attorney.

(5) That in the record is what purports to be an original power of attorney given by the scripee and her husband to Leonidas Merritt, granting him full power and authority to enter upon and take possession of any and all pieces or parcels of land in the state of Minnesota which they then owned, or might thereafter acquire or become interested in, by virtue of the location of the scrip in question; to prosecute and defend any suit at law in the courts of said state; and to grant, bargain, sell, demise, lease, convey, and confirm said land, or any part thereof, by deed, conveyance, demise, or lease, in the same manner as if performed by them individually.

(6) That on March 31, 1886, the scripee and her husband joined in a deed of confirmation ratifying and confirming, all and singular, the acts of Frank W. Eaton and Leonidas Merritt relative to the tracts in question, done and performed by them under the respective powers of attorney given as hereinbefore described.

The decision contains further recitals of findings, which appear to us to be of no value when passing upon the main question before us, and we shall have no occasion again to refer to them, except incidentally. The decision proceeds, after stating facts, as follows (the italics being our own):

"This would seem, on its face, to point to an adjudication in favor of the scrip locations; but your office decision further proceeds to say that the only other question left to pass upon, touching the legality of these locations, is whether the power of attorney given by the scripee to Frank W. Eaton, by virtue of which he made the location, *could carry with it, under the law, the power and authority to*

*make the improvements* which were necessary as a prerequisite to valid location of the scrip on unsurveyed land. On this question your office decision concludes that since the evidence shows clearly that the scripee in this case never saw the land or the improvements, or had anything whatever to do therewith, and since the *circular referred to, supra, requires that the Indian shall have a direct connection with the land, and claim the same for his or her personal use,* the scrip locations are not valid, and should be cancelled, as speculative and made with an evident intent to evade the law, rather than to comply in good faith with legal requirements."

The circular referred to was one issued in 1864 by the land department to the local officers, in which the latter were advised that scrip could be located:

"(4) Upon any other unsurveyed lands, not reserved by government, upon which they have respectively made improvements.
*    *    *
(5) When not located by the reservee in proper person, the application to locate must be accompanied by the affidavit of the agent that the reservee is living, and that the location is made for the sole use and benefit of said reservee. The land selected in satisfaction of a certificate of scrip must, of course, be located in the name of the party in whose favor the scrip is issued; and the location may be made by him or her in person, or by his or her guardian or duly-authorized agent."

The secretary then proceeds to consider the facts, "epitomized," as he claims, making several statements which are not founded upon any evidence now before us; and then he characterizes the improvements as "scarcely deserving the name." In all essential particulars, said the secretary, the case is like that of Allen v. Merrill (decided by him on the same day) 8 L. D. 207, review denied in 12 L. D. 138; and, following the rule in that case, the secretary held the location invalid.· If, on the facts as found, the secretary correctly interpreted and applied the law which governs in such cases, his decision must be upheld. But, if there was error in the construction of the statute, the decision is of no binding force in this litigation.

Before considering the law under which the scrip was located, let us briefly refer to the facts found by the commissioner of the general land office, according to the secretary's decision. The contents of the affidavits as to the extent of the improvements made

by Eaton are recited, and inferentially, at least, are found to be true. These improvements consisted of a log house fourteen by sixteen feet in size, one story high, covered with split shingles, with a door and a place for a window. Half an acre was cleared. This was done in June, under the direction of Eaton, who held a power of attorney executed by Mrs. Stram and her husband, less than a month before, to locate this scrip, and "to do all acts necessary to perfect and secure a permanent and bona fide location" thereof. We are clearly of the opinion that, from the secretary's decision, it appears that the commissioner found these improvements to have been made prior to the location. And it also appears that the commissioner found that they were made by persons employed by Eaton for the purpose, and by virtue of his power of attorney; the question being, as stated by the secretary, whether the power to locate carried with it, under the law, the authority to make the improvements required to be made upon the location of scrip on unsurveyed lands. As the scripee never saw the land or the improvements, had no direct connection with the land, and never claimed the same for her own personal use, it was held that the location was invalid, and the cancellation seems to have followed as a consequence.

The law under which scrip was issued to the half-breeds or the mixed bloods of the Sioux Nation was the act of congress of July 17, 1854 (10 St. 304). The act is not complicated. In some respects it is quite indefinite, but it empowered and authorized the president to cause to be issued to certain mixed bloods certificates or scrip for the same amount of land to which each individual would be entitled in case of a division of the Pepin reservation among them pro rata. There was a provision that these certificates or scrip might be located upon the lands within the reservation, or upon other unoccupied lands subject to pre-emption or to private sale; that is, lands which had been surveyed, and also upon unsurveyed lands not reserved by the government, "upon which the applicants have respectively made improvements." There was a provision that these certificates or scrip should not embrace more than 640 nor less than 40 acres each, and they were to be equally apportioned among those entitled.

79 M.—29

To ascertain who was entitled, reference must be had to the ninth article of the treaty of Prairie du Chien, of date July 15, 1830 (7 St. 331), from which it will appear that in a very general manner the reserved or Pepin tract was bestowed upon the half-breeds of the Sioux Nation; they to hold as all other Indian titles were held. Thereafter, and as empowered by the 1854 act, the president caused certificates or scrip to be issued to these mixed bloods indiscriminately, and without reference to age, sex, or other conditions. The result was that old and young, adults and minors, male and female, those that had but little Indian blood in their veins and those in whom such blood greatly prevailed, were the recipients. And this fact is not to be ignored when discussing the correctness of the secretary's views as found in his decision of February 18, 1889. Under the law there were issued to each one of 640 persons (Mrs. Stram being one of the 640) five pieces of scrip, thus described: 1 A, 40 acres; 1 B, 40 acres; 1 C, 80 acres; 1 D, 160 acres; 1 E, 160 acres,—a total of 480 acres each. To each one of 38 persons there was issued one piece for 40 acres, and two for 160 acres, —in all, 360 acres to each. And this is another fact to be kept in mind. There was also another proviso in the act of July 17, 1854,— "that no transfer or conveyance of any of said certificates or scrip shall be valid." It is clear that this is a positive and emphatic prohibition on the assignability of the certificate or scrip, but it is not a prohibition upon a conveyance of the land upon which scrip had been located. As was said in Gilbert v. Thompson, 14 Minn. 414 (544):

"No restraint is imposed upon the right of property in the land, after it is acquired by location of the scrip. In the scrip itself, the half-breed had nothing which he could transfer to another; but his title to the land, when perfected under it, was as absolute as though acquired in any other way. It follows that any attempt to transfer the scrip, directly or indirectly, would be of no effect as a transfer. The title to the scrip would remain in him, and the title to the land acquired by it would vest in him, just as though no such attempt had been made. Such attempt to transfer would not involve any moral turpitude, nor the breach of any legal duty, as is the case with an attempt to transfer a pre-emptive right. It would be simply ineffectual, because the scrip is not transferable."

Further considering the law, it is well to look at the construction placed upon it by the officers of the interior department soon after scrip was issued to the beneficiaries,—a construction contemporaneous with the passage of the law. We find that immediately after its issuance a circular was promulgated by the commissioner of the general land office for the information and guidance of the local officers, a clause of which read that locations might be made

"Upon any unsurveyed lands, not reserved by government, upon which they have respectively made improvements. Where the scrip may be located on unsurveyed lands outside of the reservation on which the half-breed has improvements, and which is not reserved by government, his application for location should be accompanied by a diagram and description, denoting natural objects and distances, so as to fix with certainty the exact locality wanted, serve as the best notice in our power to settlers, that conflict may be avoided, and enable you, when the public surveys are made, to designate the legal subdivisions embracing the location." 1 Lester, L. L. 628.

We have discovered that it was required, not that the improvements upon unsurveyed lands must be of a reliable or permanent character, or that they should be made by the scripee or under his personal direction, but that the application should be accompanied by a diagram and description, that the exact locality might be designated, and thus, in connection with the improvements upon the ground, conflicts might be avoided between claimants, and the locations more easily and certainly adjusted when surveys were actually made. The making of improvements by or under the scripee's immediate direction was not made of prime importance by the commissioner when preparing these instructions. The practice and custom of making scrip entries was definitely understood and well settled in the seventeen years which followed, prior to the issuance of another circular, in the year 1864, emanating from the same office and for a like purpose; and from this we have hereinbefore quoted. In this circular it was stated that where a half-breed, for himself, may make actual settlement, his improvements will be notice on the ground to any other settler.

And we are of the opinion that the purpose of this feature of the law, requiring improvements to be made where the scrip was lo-

cated on unsurveyed lands, must have been that visible notice, by work done on the ground, might thereby be given to other persons of the scripee's prior right, and thus prevent collision and conflict. The language as to improvements was general and vague. None were required where surveyed lands were located and it is very evident that this requirement was for a minor purpose. Obviously, it was not the design of the law to compel actual settlement or residence upon the land; for, had it been, the language would have been plain and unambiguous. This purpose was accomplished wherever the improvements were of such a character as to be notice, and their value or extent was of little consequence. That in this case they were ample, as notice, ought not to be questioned. The entire purpose of the act itself seems to have been to promote and secure an exchange of the interests of the mixed bloods in the reservation, which was becoming valuable for actual settlers, for certificates or scrip which would be available for the acquirement of title in fee to specific parcels of land there or elsewhere on the public domain. It was proposed to compensate the mixed bloods, who surrendered their rights or claims under the treaty, in a manner which would be of some value, and it has been held that the fact that the government saw fit to make the scrip, as such, nonassignable, does not operate to prevent the beneficiary from making an agreement before location, or giving power to convey the land when the scrip shall have been located and the land entered.

We need not cite decisions in support of this proposition for they are abundant,—federal and state. Nor need we stop to consider why congress saw fit to declare that the scrip should not be assignable, and yet failed to deprive the scripee of the power of alienation immediately after the location, and in pursuance of a bargain previously made. It is enough to know that the prohibition related solely to assignments of the scrip itself. So that, as before stated, the question is, was the land validly appropriated by the location of the scrip in the name of Orillie Stram, to whom it had been issued, with four other pieces; and the only invalidity found by the commissioner of the general land office and the secretary was that Mrs. Stram had not seen the land or improvements, and did not have direct connection with either, and never claimed the same for

her personal use. The rules and regulations of the land department had not been complied with, it was stated, and it was held that this was sufficient to justify the cancellation.

Under the decisions of the land department, as well as those of the courts, a scripee can empower another to do all things necessary as a condition precedent to a location, and then to actually locate. The improvements were made under the direction of a duly-authorized agent, and then the entry was made in the name of the scripee by the same agent or attorney in fact. Mrs. Stram did not complain of this entry, and urge that her rights had been disregarded. Upon the other hand, she ratified and confirmed every act performed by her attorney in fact, by a properly executed deed, executed in March, 1886. Now, when we examine some of the provisions of the law, we are led to ask, could it have been the intention that each person to whom certificates or scrip was issued should see the land, in person, upon which each piece was to be located, or should, in person, see the improvements, or claim the same for-personal use, or be directly (that is, personally) connected with either or both? Under this law the president was authorized to do what was actually done,—issue to each person entitled several pieces of scrip, of different sizes or acreage. Was it expected that each of these persons should be personally connected with the several and separate improvements required to be made, if all of the pieces were located on unsurveyed lands, and would have to claim the same for personal use? Surely not. This law contemplated and there were actually issued several pieces of scrip to each of a large number of minors. Babes in arms were held to be entitled, and to them scrip was issued, and in many cases located before the minors reached majority, as might reasonably be expected.

With these facts before us, can it be urged that congress thought or intended that these minors would be required, by a construction of the law, personally to supervise the selection of from three to five tracts of land on which to locate their pieces of scrip, or that they would have to be directly connected with each of these locations, or, in case unsurveyed lands were desired, they would have to claim the necessary improvements as their own? In other

words, do not these facts indicate, to a moral certainty, that it never occurred to the members of congress that the construction placed on this law by the secretary would be given to it at any time,—much less, after thirty years of a wholly different construction? And a construction, also, which received judicial recognition and approval. See Gilbert v. Thompson, supra; Hope v. Stone, 10 Minn. 114 (141); Marks v. Dickson, 20 How. 501. We are confident that they do so indicate, and that the requirements found in the circular of May 28, 1878, were not in accordance with the law, and were therefore unauthorized. The act itself never required that the improvements should be of a certain kind or value, or that the scripee should be directly connected with the land. It quite conclusively appears to the contrary, when we consider the facts before referred to, unless we take the position that the legislative branch of the general government intended to confer upon the mixed bloods, in exchange for their interest in the reservation, scrip which would be of no value unless the recipients made personal selections, were directly connected with the locations and improvements, and made claim to both for their own use and benefit.

It is urged that Eaton's entry amounted to an evasion of that part of the law which forbade an assignment of the scrip; the well-known rule being invoked, that an act which cannot be done directly cannot be accomplished indirectly. But if an agent can be authorized by the scripee to do all acts that may be necessary as a condition precedent to a location, and may also be authorized to carry the scrip to the land office and complete the entry (and this, it is well settled, may be done), why is not the prohibition evaded quite as completely as the secretary claimed it was in this case? The evasion is in every case where a contract of sale is made or contemplated, if it is in one. Locations under such circumstances have been repeatedly, almost universally, upheld; the officials of the department declaring, however, that the scripee cannot assign the scrip, that the location must be in the name of the person to whom the same was issued, and that the patent must be so issued, but further holding that, as the power to alienate is unrestricted by the law, an agreement to sell is not a matter for determination

in the land department. It seems very apparent that the effect and validity of such an agreement must be left to the arbitrament of the courts, and not to the decisions of the government officials.

We have not discussed the point made by counsel, that as the method adopted by Mr. Eaton was in accord with the long-continued practice of the department, as set out in its circular of 1857, the action of the commissioner and the secretary should be set aside as unwarranted. We think it unnecessary. Nor do we consider at length the further point that the location of July 21, 1885, after the lands had been surveyed and the plats returned, was a valid location, even if the earlier one was invalid for the reasons assigned by the officials. It is true that the Hyde claim was the only one intervening when this scrip was adjusted or again located, and that claim was corrupt and invalid, as has been finally determined. So when the application of July 21 was made there was no valid, existing adverse right which had attached, and which stood in the way of a location of the scrip as upon surveyed lands, no improvements being necessary. There was no forfeiture of the scrip by the previous attempt to locate. If invalid, it was nothing but an attempt. No moral turpitude or breach of any legal duty was involved in the first location. If Mr. Eaton, as the agent, had there expressed a desire to withdraw and relinquish all rights acquired previously, and to lay that particular piece of scrip on the land in question, as of that day, would not his right so to do seem unquestionable? And would not the obligation of the local officers to permit this act to be done appear to be beyond doubt? If this be true, why was not the legal effect of the adjustment a location of the scrip upon surveyed lands, there being no valid claim or right intervening and in conflict? The application then made was sufficient in form for an original location. If the scripee, Mrs. Stram, either in person or by agent, could that day have successfully applied for this land, had she never made any previous attempt to obtain it, why should the application be rejected? Surely not on the ground that she had tried before, and failed while the land was unsurveyed.

Our conclusion is that upon the facts as found, hereinbefore stated, the commissioner of the general land office and the secre-

tary of the interior erroneously construed the law, and imposed unwarranted conditions. The decision of the latter appears to have been predicated upon a circular of instructions, not upon a statute. It was error to hold that under the act in question it was vital that the scripee should see the land or the improvements prior to the entry, and that an agent could not act in her behalf, when duly authorized, not only in selecting the land itself, but in making such improvements as would in themselves, and without regard to their value, be notice on the ground of the assertion of a prior right. It was error to hold that the scripee had nothing to do with these improvements, for she had empowered an attorney in fact to make them. It was error to hold that the scripee must have direct connection with the land. And if, by his decision that the scripee must claim the land for her own personal use, the secretary meant that such claim must be formally made, or made in good faith, or must be established by proof other than or different from that before the land department in this particular case, he was in error.

There was not even an intimation in the law that the scripee should personally inspect or select the land, or should make in person, or even examine, the improvements. Scrip was issued in from three to five separate and distinct pieces, and of different acreage. It was issued to persons who were old and decrepit,—physically and permanently incapable of complying with the requirements established by the secretary. Was the fact that they were old and disabled to be used to their injury, and were they to have nothing but unavailable pieces of paper? Certificates of scrip were issued to infants who would not reach a suitable age for obeying the behests of the land officials for a score of years. Were they expected to act through guardians or other agents, and have some benefit of the provisions of the law, or were they expected to wait until majority came to them, and then to comply with the circular requirements? No distinction or discrimination was made in the law between the adult and the minor, and the department could impose none by requiring less of the minor making a location than of the adult. Nor did the law require that the land on which the scrip was located must be selected by the mixed bloods for personal use, or even that a claim of this kind should be made. In fact, as we

have seen, the inference to be drawn from its language, and from what was done at and about the time, is to the contrary. And the secretary erred in holding, upon the facts as found, that the scripee had no interest whatever in the location made by her attorney in fact. Such a holding is, in effect, deciding that every piece of scrip issued to the mixed bloods which cannot be used by the recipient for his or her own personal benefit, and for the acquirement of land for his or her own personal use, could not be used at all, and was of no value.

Finally, we hold that on the facts and the law the location in behalf of Mrs. Stram was proper and valid. It was error on the part of the officials of the land department to cancel the location and entry. Mrs. Stram or her successors in interest could not be deprived of her rights in the land by the assumption of a supervisory power by these officials, or by the issuance, under their direction, of a patent to another person. The act of July 17, 1854, did not provide for the issuance of a patent, and the title to the property passed to Orillie Stram, née Moreau, by virtue of the location.

The findings of fact justified the conclusions of law in the court below, and the judgment is affirmed.